# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

LYLE REIGEL,

    Plaintiff,

  v.             Case No. 04-C-365

RICHARD WHELAN,

    Defendant.

---

**DECISION AND ORDER**

---

Plaintiff Lyle Reigel invested in a startup company called Storage Revolution, Inc. (SRI), which was at least partly the brainchild of defendant Richard Whelan. Reigel did not invest directly in SRI stock, however. Instead, he purchased an interest in Whelan's company, Whitman Place LLC, which already owned SRI stock it received due to Whelan's status as a founder of SRI. After some initial success, the value of SRI stock fell dramatically during 2002. Reigel sued Whelan under Wisconsin securities law and other common law theories for various misrepresentations he made, as well as for Whelan's failure to disclose his own allegedly shady past with securities regulators. Whelan removed the case to federal court based on federal diversity jurisdiction, added his own counterclaims, and filed a motion for summary judgment. Following briefing by the parties, this court heard oral argument. Upon consideration of the briefs and the arguments made by the parties, I conclude that Whelan's motion for summary judgment should be granted as to Reigel's claims against him. The motion will be denied, however, as to Whelan's claims against Reigel.

## I. Background

Lyle Reigel is the president of U.S. Paper Converters in Appleton and is an experienced investor and entrepreneur. He met up with Richard Whelan in 1996 and soon began investing in ventures organized by or involving Whelan. The first such investment involved the Monolith Fund, a limited partnership whose general partner employed Whelan. Reigel, before investing, received an offering circular that disclosed the fact that Whelan was the subject of certain regulatory actions including one brought by the Arizona Corporation Commission (ACC), two brought by the National Association of Securities Dealers (NASD) and one brought by the SEC.

In 1999, Reigel invested in the Orlando Predators, an Arena League Football team owned principally by the Monolith Fund. Before investing, he received a proxy statement which made similar disclosures about Whelan's past, including the fact that the NASD had fined, censured and suspended him for five days from selling securities. It also disclosed that the Arizona Corporation Commission had cancelled his securities license. Soon after, Reigel made another investment, this time in a venture called the Legacy Fund. Legacy's offering circular also disclosed that the ACC had fined him and revoked his license "as a result of the filing of misleading broker-dealer information, the use of manipulative trading practices and the sale to an individual of unregistered securities in Arizona." (DPFOF ¶ 17.)

During this period, Reigel and the Monolith Fund were also investing in a startup company called Quepasa.com, which was due to go public in 1999. During June 1999, however, the NASD became concerned about Whelan's involvement in Monolith due to his past history of securities infractions. Because of these concerns, the exchange made Whelan sell his shares in Quepasa prior

2

to the IPO and also made Monolith divest itself of its shares, given Whelan's employment with Monolith. The Fund thus had to sell its shares back to its underwriter for $6 per share and was unable to capitalize on the ultimate IPO price of $12 per share.

As mentioned at the outset, the investment at the center of this case is called Storage Revolution, Inc.,which is a business that supplies temporary storage containers to businesses. The idea for the company was Whelan's, in collaboration with a man named Bob Brewer, who became the company's CEO. Given Whelan's securities past, however, he stayed on the sidelines while the company was seeking funding so as not to jeopardize a potential IPO. Whelan did not remain completely uninvolved, however. He created an LLC named Whitman Place, which, along with the other founders, bought 2 million shares of "founder's stock" at 5 cents per share. The idea was to preempt any regulatory troubles by (a) ensuring that Whelan did not personally own any SRI shares, (b) placing control of Whitman Place in a third party, a retired lawyer named Arthur Blumenthal, and (c) placing all of Whitman's SRI shares into an irrevocable proxy to be voted by Brewer, SRI's CEO. Thus, while Whelan would enjoy an economic benefit if SRI was successful, he would not have any control over the company itself.

At some point in early 2001, Reigel notified Whelan that he wanted to invest in SRI. In 2000 he had loaned a million dollars to the company and was promptly paid back with interest, which apparently impressed him. At the time, the company was raising money through a private placement offering at $4.00 per share, but Reigel wanted a better deal. Whelan's idea to get Reigel involved at a lower price was to allow Reigel to purchase shares that Whitman Place already owned (and had paid a nickel apiece for), which would net Reigel a lower price and allow him to forego paying any brokerage fees. Reigel liked the idea, and invested in Whitman Place on April 11, 2001.

He agreed to pay Whitman Place $1.35 million, which he wired the same day, for a 25% stake in the LLC. Under the operating agreement, Reigel had a put option which, if exercised, would require Whitman Place to buy out his interest in exchange for 500,000 shares of SRI stock. In practical terms, this meant that Reigel had the ability to purchase SRI shares for $2.70 per share ($1.35 million divided by 500,000 shares) rather than the $4.00 per share that other investors were paying.

SRI's subsequent efforts to raise money at $4.00 per share failed, requiring the company to drop the offering price dramatically. During the early summer of 2001, it was able to raise over $2 million by selling shares between $1.25 and $1.60 per share. This, of course, meant that Reigel's deal at $2.70 per share was now quite unfavorable. After protesting to Whelan, Whitman Place ultimately agreed that Reigel would be entitled to exercise an option for 1.1 million SRI shares at no additional cost to Reigel.[1] This lowered his per-share price to $1.23–still lower than those buying into SRI's private placement.

Allegedly in exchange for repricing Reigel's option, Whelan asked that Reigel sign a release as a part of a profit sharing agreement entered into June 6, 2001. (Tsao Decl., Ex. 24.) Reigel signed the agreement and agreed to "release from any claims of wrongdoing and hold harmless Mr. Whelan with regard to any of the following past Reigel transactions: investments in Quepasa.com, . . . Whitman Place, LLC, Storage Revolution, . . . ;" he further agreed not to bring legal action against Whelan regarding any of the listed transactions.

Ultimately, Reigel exercised his option to purchase SRI stock in February 2002, at a time when the company had been raising money by selling shares in a private offering at $1.89 per share.

---

[1]Other agreements were also involved, but the ultimate result was Reigel obtaining an option for 1.1 million shares.

4

Thus, at the time he exercised his option he was able to buy shares of SRI at a roughly one-third discount to the price others were paying. By March 2002, in addition to Reigel, Whelan, and the founders who had been in from the beginning, there were now some 90 accredited investors in the company.

It is necessary at this stage to pause and return to Reigel's initial investment in Whitman Place. He wired the $1.35 million to Whitman Place on April 11, 2001, but before doing so he claims that Whelan made two promises to him. (Compl. ¶ 6.) The most important of these was that Reigel's investment would be used as working capital of SRI. In other words, although Reigel was essentially buying the shares from a third party (Whitman Place, LLC) on the quasi-secondary market–i.e., he was buying shares that already existed rather than new shares the company was issuing itself–he believed that the money he paid for those shares would go not to Whitman Place (the seller) but to SRI itself. Although the parties did not dwell on this in their briefs, oral argument fleshed out the fact that Reigel's is a somewhat remarkable claim: if true, it meant Whelan was willing to sell his own personal founder's stock to Reigel (through Whitman Place) yet allow the proceeds of that sale to be enjoyed by a company of which he only owned a part. That is, the money would benefit *all* of the stockholders even though only Whelan had given up any of his shares.

By way of example, suppose that Bill Gates, who owns roughly 10% of Microsoft, Inc., sold a million shares of the company. One would not expect him to donate the proceeds from the sale to the company–he would simply keep them for himself. True, as a large owner, he would enjoy a substantial benefit from a contribution to the company's working capital, but his benefit in that instance would be small compared to the benefit he would realize had he merely pocketed the

5

money.[2]  Moreover, the question arises why a founder, assuming he was being altruistic, would go through so much trouble.  If the company was truly intended to receive all of the funds, why not simply tell Reigel to invest directly in the company?

In any event, Reigel also claims Whelan promised him that Whitman Place could control the share price of the SRI stock and guarantee that Reigel would pay a price for the SRI shares lower than or equal to anyone else.  Although Reigel was able to renegotiate his price down to $1.23 per share–lower than any other non-founding investor–he was not able to purchase SRI shares for the same five cents per share that the founders had paid.  These two affirmative promises–that his investment would go to SRI directly rather than Whitman Place or Whelan, and that he would pay the lowest price for SRI shares–allegedly induced him to invest in Whitman Place.

In addition to relying on these promises, Reigel also claims he was induced to invest in Whitman Place because of what Whelan did *not* say.  Specifically, Whelan never disclosed his regulatory problems with the SEC or any other governmental or self-regulatory organization.  Nor did he disclose the fact that in March 2001 (less than a month prior to Reigel's wiring of the $1.35 million to Whitman Place) a federal district court had found that Whelan and an associate had lied to their customers and had knowingly engaged in illegal activities in Arizona during the early 1990s.  (Meier Aff., Ex. C.)  That court also issued a permanent injunction barring Whelan from violating any securities laws in the future.

---

[2]On the other hand, because Whitman Place would still retain control of 1.5 million shares of SRI at the time the money was wired, Whelan may have been willing to make the sacrifice if he believed the company would really take off, such that the "donation" to the company's working capital, even though it would be shared by all stockholders, would actually increase his upside in the long run.  Yet if that were the case, why would he sell his own shares at all?

6

## II. Reigel's claims

Reigel brings this case under Wisconsin's securities laws, Wis. Stats. §§ 551.41 and 551.59, as well as under common law theories of misrepresentation (i.e., fraud). Section 551.59(1)(a) reads:

> Any person who offers or sells a security in violation of s[ection]. . . . 551.41 . . . is liable to the person purchasing the security from him or her. The person purchasing the security may sue either at law or in equity to recover the consideration paid for the security, together with interest . . . .

> Section 551.41 reads:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly:
> (1) To employ any device, scheme or artifice to defraud;
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Read together, these sections generally allow a buyer of securities to recover the price paid for the securities (under § 551.59) at issue if the seller defrauded the purchaser (in violation of § 551.41). As noted above, the fraud alleged in this case involved both misrepresentations and omissions. The misrepresentations include Whelan's guarantee that Reigel would receive the lowest stock price and his promise that Reigel's investment would go to the working capital of SRI rather than Whitman Place or Whelan. The omissions involve Whelan's failure to disclose his extensive history with regulatory authorities as well as the March 2001 federal district court decision. Whelan offers several reasons (both legal and factual) why Reigel cannot win; I will begin by addressing the issue of loss causation.[3]

---

[3] Whelan does not argue that Reigel's action is barred by the release Reigel gave him when the original agreement was modified. At argument, Whelan acknowledged that Reigel's claim of fraud, if there was evidence to support it, would render the release void. *See Fullin v. Martin*, 34 F. Supp. 2d 726, 737 (E.D. Wis. 1999).

7

**1. Loss Causation**

In his reply brief, Whelan argues that because none of Reigel's losses on SRI stock were caused by Whelan's alleged fraud, Reigel cannot recover under the securities laws. To make clear his argument, suppose that, instead of corporate stock, Reigel was interested in buying a car from Whelan. When asked about the car's engine, Whelan lied and claimed the engine was a V-8, when in fact it was a more pedestrian V-6. He also failed to disclose that the car was stolen and that he had a criminal history involving auto theft. In reliance on these omissions and misrepresentations, Reigel purchased the car. One year later, Reigel was injured in a crash caused when the car's brakes failed, a problem which neither party had known about at the time of sale. In one sense, Reigel's injuries were caused by Whelan's fraud because but for that fraud Reigel would not have purchased the car in the first place. But in another sense, the injuries were caused not by any fraud but from a mechanical problem having nothing to do with Whelan's misrepresentations or omissions. That is, the crash was wholly unrelated to the subject matter of either Whelan's misrepresentations or omissions.

This example implicates the difference between transaction causation and loss causation. A federal securities fraud action requires a plaintiff to show that he was induced to purchase securities (i.e., to undertake the transaction) based upon a misrepresentation. *See Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 186 (2d Cir. 2001). In other words, he must show that the misrepresentation was the actual, or but-for, cause of his injuries because the misrepresentation induced the plaintiff to purchase the securities in the first place. But the federal securities laws also require that the *loss* be caused by the misrepresentations. This requirement imposes a *legal* (or proximate) causation element on plaintiffs, meaning that they must link the fraud to the particular

loss that they suffered. The Supreme Court has recently noted that there are a "tangle of factors affecting price" which might cause the loss but be unrelated to any misrepresentations, *Dura Pharmaceuticals, Inc. v. Broudo,* ___ U.S. ___, 125 S.Ct. 1627, 1632, 161 L. Ed. 2d 577 (2005), and if that is the case, the plaintiff loses.

Most federal securities fraud actions are founded in Rule 10b-5, the rule at issue in *Dura Pharmaceuticals.* Courts have created a private right of action under that rule and, in doing so, have imposed the loss causation requirement noted above. But Reigel's action is based not in Rule10b-5 (nor Wisconsin's corollary to it) but in Wisconsin's version of section 12 of the Securities Act of 1933. Courts have not generally imposed a loss causation requirement in the context of section 12, however, because the remedy is recision, a remedy linked not to any particular loss but to giving the plaintiff his money back. In particular, § 551.59 allows a purchaser to "sue either at law or in equity to recover the consideration paid for the security" when a violation of the securities laws has induced the purchase. It does not say that to get one's money back one must have suffered a loss *caused* by the fraud; the section simply allows for recision of the deal if the seller committed fraud. While Whelan makes a convincing argument that the statute *should* include a loss causation requirement, at this point it does not and for me to read that requirement into what is a fairly plain statute would be to insert this court improperly into Wisconsin's legislative process. Whelan also notes that Congress changed section 12 in the late 1990s to specifically add such a requirement, *see* 15 U.S.C. § 77l(b), and further notes that Wisconsin's securities laws are meant to be interpreted so as to conform generally to the uniformity that federal law provides. But Wisconsin has not amended its own statute, and its plain language counsels against imposing such a requirement

9

without legislative guidance on the issue. Accordingly, I do not find that Reigel's inability to show loss causation is fatal to his securities claim.

Although loss causation is not required for Reigel's securities claims, Reigel admits that it is required for his common law misrepresentation claims. (Tr. at 92.) *See Kain v. Bluemound East Indus. Park, Inc.*, 635 N.W.2d 640, 648 (Wis. App. 2001). He claims, however, he has evidence showing his losses in the stock were caused by Whelan's misrepresentation that he would pay the lowest price for the SRI stock in advance of any public offerings. Because he did not receive the five cent per share price that the founders received, Reigel argues, his loss should be calculated by the benefit of the bargain he *should* have received, i.e., the difference between five cents and the $1.23 per share price that he did pay.

This claim is wholly unsupported by the evidence, however. First, there is no way to view Reigel's loss, which was caused by the collapse of SRI, as somehow being "caused" by the fact that he paid more for his shares than he had hoped to pay. His stock would be worthless now whether he paid five cents for it or $4.00. Second, even if he could avoid that fact, his theory is based on the unsupportable premise that the benefit of his alleged bargain was that he should have been able to buy 500,000 shares of SRI stock for a nickel apiece. Under this theory, his damages from the failure to achieve this bargain are the difference between what he actually paid ($1.35 million) and what he should have paid (a nickel per share, or $25,000). There is absolutely no evidence, however, that such a scenario would have been acceptable to the parties or even economically feasible. A total investment of merely $25,000 was never in the contemplation of the parties; instead, everything in the record and argued by the parties indicated that Reigel wanted to invest substantial sums of money in SRI (i.e., more than one million). Accordingly, there is no basis in

10

the record to conclude that Reigel's loss had anything at all to do with the particular price he paid for his shares. He simply lost money because he invested a sum of money in shares that later lost their value. Thus, because he cannot show loss causation, summary judgment is properly granted on the common law fraud claims in favor of the defendant.

**2. $1.35 million to be used for working capital of SRI**

I will now proceed to address the evidence relating to the particular fraudulent statements that Reigel claims Whelan made to induce his investment, in violation of Wis. Stat. § 551.41. The most important statement alleged is that Whelan told Reigel that his $1.35 million investment in Whitman Place would be used as the working capital of SRI, *not* given to Whitman Place or Whelan himself. Reigel claims to be outraged that Whelan went on a "spending spree" with the money and even bought himself a $56,000 piano.

As alluded to earlier, Reigel's claim makes no business sense. Why would Whelan sell his own founder's shares and then donate all of the proceeds to the company? More importantly, even if Whelan wanted to do just that, Reigel does not explain how giving the money to the company would be achieved–would it be through another purchase of stock (and at what price) or simply a gift? Reigel has no real answer to these problems with his theory. Of course, parties should not be penalized for their sophistication; but when a sophisticated investor alleges he relied on a statement that simply makes no sense, it is difficult to believe that a genuine issue of fact exists that the statement was actually made.

If the implausibility of this alleged statement were the only factor involved, it might be a close question whether summary judgment could properly be granted. But in addition to the problems just noted, there is documentary evidence that consistently undercuts the plaintiff's

11

argument. First, the April 11, 2001, Whitman Place operating agreement contains no limitations or directives regarding how Reigel's investment was to be spent. It is true that the agreement does not flatly contradict Reigel's claim, but one would think that the representation Reigel now claims was key to inducing his investment would have been spelled out in writing. Indeed, absent evidence to the contrary (and there is none), one would conclude that the transaction between Reigel and Whelan was a simple purchase of stock (or rights to stock) on the secondary market. One person received the stock and another received a profit by selling the stock.

In addition, there is substantial evidence that Reigel was aware of the fact that Whitman Place had not sent his investment directly to SRI. In August 2001, his attorney proposed an amendment to the operating agreement by which Reigel could get half of his money back from Whitman Place if he chose not to exercise his option. Responding to this proposal, Blumenthal, Whitman Place's manager, floated the idea of returning all of Reigel's investment. Both of these instances show that Reigel was fully aware that Whitman Place still had his investment (or was at least able to return it to him), something which would be impossible if it had contributed Reigel's $1.35 million directly to SRI. Yet Reigel did not protest until a year later when SRI was in dire straits.

Finally, as discussed below, Reigel's claims of fraud are self-contradictory. On the one hand, he claims that he was promised he would pay the lowest price for the shares and that he did not know the founders (including Whitman Place) had paid only five cents per share. Thus, he invested only because he believed he was getting the lowest price of *any* investor, including the founders. Yet if that were true, Whitman Place would make no profit on the sale of its shares to Reigel because it had paid (Reigel believed) the same price he paid for them. If Whitman Place

12

made no profit on the sale, how did Reigel believe Whitman Place was going to be able to contribute the $1.35 million to SRI since, in his view, Whitman Place had *already* paid $1.35 million for the shares (i.e., the same price he paid)? It makes no sense to think Whitman Place, at the time of SRI's founding, would pay $2.70 per share for the 500,000 shares it sold Reigel and then, when it resold those shares to Reigel, would pay *another* $2.70 per share directly to the company. Investors tend not to want to pay twice for the same shares. The only way it would make sense to believe Whitman Place could contribute money to SRI is if Reigel *knew* it was making a large profit on the sale, in which case he would also know that it had paid a much lower price than he had. But that is soundly contradicted by Reigel's own theory of the case.

In sum, we are faced with the plaintiff's claim that Whelan made an oral promise to him that is: (1) unsupported by the record, (2) the sort of promise one would expect to be memorialized in the parties' formal agreement, (3) contravened by Reigel's actions upon learning that the alleged promise had not been fulfilled, (4) contradicted by his other claim of fraud, and (5) lacking in any business sense. I am mindful that summary judgment proceedings are not trials in which judges weigh conflicting evidence; but when the evidence is so one-sided that it would not be reasonable to conclude otherwise, I am compelled to find that there is not a *genuine* dispute about the material facts in question. Accordingly, I conclude that summary judgment is appropriately granted to the defendant on Reigel's claims based on alleged misrepresentations about Whitman Place's use of his investment funds.

**3. Buying stock at the lowest price**

The other affirmative misrepresentation Reigel alleges Whelan made is that Reigel would be able to buy stock at the lowest price, when in actuality the price he charged Reigel was much

13

higher than the five-cent-per-share price paid by SRI's founders. Absent that promise, Reigel alleges, he would not have invested in Whitman Place. Once again, Reigel has difficulty in explaining the business sense of this alleged promise. In buying stock through Whitman Place, rather than SRI itself, he knew that he was buying stock that already existed–an LLC has no power to create stock in another company. Its stock–2 million shares' worth–existed because Whitman Place (courtesy of Whelan) is a founder of SRI. Reigel's argument is essentially that he should have received the same deal that the founders of SRI received, and that if he had known they got a better deal he would not have invested.

This claim falters on a number of logical steps. First, as already noted, because Reigel's claim is that he believed he was getting the best price, he had to believe that the founders, including Whitman Place, had bought their own shares *at the same price he was paying for them,* i.e., $2.70 per share. If that were the case, Whitman Place would have no ability to contribute any money to SRI for the shares because it made no profit on their sale (unless of course it wanted to pay SRI *twice* for those shares). Thus, the two claims of fraud make no sense when read together.

A second problem also relates to his claim that he did not know any founders had paid a lower price for their shares. Reigel initially paid $1.35 million– $2.70 per share–for the 500,000 shares for which he was granted the option. Thus, if he really thought he was getting the best price, he must also have believed that Whitman Place itself had purchased its original 2 million founder's shares for at least $2.70 per share (the same price he paid), which results in a total Whitman Place investment of $5.4 million. There is absolutely no evidence in the case suggesting that SRI had received millions of dollars from its founders, nor that Reigel could reasonably have believed that

14

to be true given the company's financial situation and its frequent private offerings, the entire goal of the which was to raise this kind of money.

A final logical problem relates to Reigel's claim that if he had known the company had issued five-cent stock he would have demanded it for himself (under the terms of the alleged oral promise from Whelan). If true, Reigel must have believed that he would be entitled to *27 million shares* of SRI (his investment of $1.35 million at five cents per share), when all of the founders' shares totaled only a few million, a claim which (again) makes no sense. First of all, he was investing in an LLC which only had 2 million shares at its disposal and lacked the ability to manufacture shares of another corporation out of thin air. Second, it is wholly inconsistent with the evidence in the record to suggest that SRI would sell the overwhelming majority of its shares (27 million) for so cheap, all the while attempting to raise money on the private markets for additional capital. Thus, for Reigel to have believed what he now claims he believed is simply incredible because the numbers do not add up.

That said, Reigel's arguments are defeated not only by logical and economic improbabilities but also by documentary evidence. In particular, the April 11, 2001 operating agreement (i.e., the agreement as of the date he wired the money to Whitman Place) indicates that Blumenthal, the LLC's manager, had contributed $100,000 and Reigel had contributed $1.35 million. Section 3.7 of the agreement indicates that Blumenthal's contribution, the $100,000, was used to purchase 2 million shares of SRI. (Tsao Decl., Ex. 22.) In other words, the very operating agreement that Reigel signed states that Whitman Place had purchased the shares for five cents each. His claim to the contrary is refuted by the many layers of improbability as well as the documentary evidence indicating that he knew exactly what was going on. In the face of this documentary evidence,

Reigel's bare contrary assertion is not sufficient to withstand summary judgment. *See Associates In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir. 1991) ("[N]o jury could find that a reasonable investor would be misled by the statements Schwarz related, when the truth was under his nose in black and white (many times over).").

**4. Omissions about Whelan's regulatory and legal problems**

Reigel's third basis for securities fraud involves not what Whelan said, but what he did *not* say. Specifically, he argues Whelan failed to disclose his past regulatory background involving actions by the ACC, SEC, and NASD. He focuses most assiduously on the fact that Whelan did not disclose the March 2001 federal district court decision, alleging that "if this decision and finding were to have been made known to Reigel, he would not have invested in SRI through Whitman." (Pl.'s Br. at 23.)

Under Wisconsin's (and federal) securities laws, an omission is grounds for fraud when a person selling securities "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Wis. Stat. § 551.41. Wisconsin's statute, which mirrors the language of federal Rule 10b-5, clearly requires a plaintiff to identify a statement made by the seller and then point to a fact the omission of which makes the statement misleading. "The language of 10b-5 proscribes only those omissions that render affirmative statements misleading. The positive law duty to disclose is created when a firm makes a statement that would be rendered false or misleading without the disclosure." *City of Austin Police Retirement System v. ITT Educational Services, Inc.,* 388 F. Supp.2d 932, 945 (S.D. Ind. 2005).

Reigel, however, has not identified one single statement that he alleges was rendered misleading due to Whelan's failure to disclose his regulatory past. Instead, Reigel proceeds as if

16

materiality were the only question at issue here. Under his theory, Whelan's checkered history was material to Reigel's investment decision because it would have significantly altered the total mix of information available, *see Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988), and *therefore* it had to be disclosed. But the securities laws do not mandate a "full disclosure" rule under which anyone buying a security is entitled to all material information about that security. Instead, as the statute clearly says, an omission violates the law only when an affirmative statement would be misleading due to the omission. Wis. Stat. § 551.41. In other words, "Rule 10b-5 imposes liability for an omission only when there is a duty to speak." *Gavin v. AT & T Corp.,* 2005 WL 1563122, at *11 (N.D. Ill. 2005). The duty to speak does not arise whenever material information goes unsaid, but only when what *has* been said would be rendered false.[4] *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995) ("Mere silence about even material information is not fraudulent absent a duty to speak."); *Basic, Inc.,* 485 U.S. at 239 n.17 ("[S]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."). Accordingly, because Reigel only alleges silence about a material fact without linking that silence to any duty to disclose, his securities claim based on Whelan's omissions fails as a matter of law.[5]

_____

[4]In other sections of his brief, Reigel notes that earlier prospectuses provided by funds in which he invested disclosed some information about Whelan's regulatory problems. But his argument is that Whelan never told him *at all* about any regulatory problems, not that what he did tell him was rendered misleading by what he did not tell him. (Pltf. Br. at 4-5.) Indeed, he claims to be insulated from any disclosures because he did not even read the prospectuses in question. Thus, there is no argument made that Whelan ever said anything about a regulatory problem that was misleading because of what he omitted.

[5]Reigel argues summarily (in an unrelated section of the brief) that he and Whelan had a fiduciary relationship based on the level of trust arising from their past dealings together. The fact that businessmen form long-lasting relationships does not transform those relationships into fiduciary ones. Instead, the duty arises when one individual, such as an attorney, trustee, or broker, assumes such a high level of control or power over another's interests that the law requires a heightened level of responsibility and trust. As the Wisconsin Supreme Court has put it,

Moreover, even if Reigel could somehow demonstrate that Whelan was under some kind of duty to disclose everything about his own history, Reigel cannot show that he relied on Whelan's failure to do so. The entirety of the evidence in this case indicates that Reigel's sole concern was to obtain shares of SRI at a low price and without paying a commission; SRI was the goal and Whitman Place was merely a tool, a means to that end. As detailed above, Reigel knew that Whitman Place had 2 million shares of SRI stock, and his investment into Whitman Place was made solely to obtain the ability to buy the SRI shares. Whitman Place, by design, was divorced as much as possible from SRI due to Whelan's regulatory history, and (again by design) Whelan had absolutely no role in the management of SRI. Whitman Place was run by Art Blumenthal. Thus, there is no logical connection between Whelan's own problems and Reigel's investment in SRI. Reigel simply wanted the SRI stock, which Whitman Place clearly possessed, and would have bought into Whitman Place regardless of Whelan's history. For that reason alone, he has no basis to claim he relied on Whelan's omissions about his past.

In sum, Reigel's claims are founded in layer upon layer of implausibility. They are either flatly contradicted by the documentary evidence or, at best, are rendered fatally unbelievable in light of that evidence. His two claims of affirmative misrepresentation are logically contradicted by each

---

A fiduciary relationship arises from a formal commitment to act for the benefit of another ... or from special circumstances from which the law will assume an obligation to act for another's benefit. In determining whether a fiduciary relationship has arisen, courts consider a variety of factors, including whether there is dependence and inequality based on weakness of age or mental strength, lack of business intelligence, inferior knowledge of facts involved, or other conditions giving one side an advantage over the other.

*Doe v. Archdiocese of Milwaukee,* 700 N.W.2d 180, 194-95 (Wis. 2005)(citation omitted).
None of these qualities were present here. Instead, Whelan and Reigel (a sophisticated investor) essentially created an LLC together to invest in a third company and, in doing so, each was looking out for his own interests.

other, and his claim based on omissions fails to identify any duty not to omit.  For those and other

reasons, Whelan's motion for summary judgment is granted as to Reigel's claims.  I now turn to

Whelan's motion for summary judgment on his own counterclaims against Reigel.


## III. Whelan's Counterclaims

### 1. Defamation

Upon being sued, Whelan brought his own claims against Reigel.  First, he claims he was

defamed when Reigel wrote to SRI's board of directors stating that he had "invested $1,350,000 in

Storage Revolution . . . ," his check was "cashed personally by Rich Whelan," and "He [Whelan]

failed to deposit any part of it into the corporation account!"  (DPFOF ¶ 68.)  Whelan claims

Reigel's statement to the board was "knowingly and recklessly false, and motivated by ill will

toward Whelan."  (Br. in Supp. at 37.)  He claims he is entitled to compensatory and punitive

damages.

Under Wisconsin law, to establish a claim for defamation, a plaintiff must prove that (1) the

defendant made a false statement; (2) it was communicated by speech, conduct, or in writing to a

person other than the person defamed; and (3) the statement is unprivileged and tends to harm one's

reputation so as to lower one in estimation.  *Kennedy v. Children's Service Society of Wisconsin*,

17 F.3d 980, 983 (7th Cir. 1994).  Where the defamatory statement is in writing, or constitutes

slander per se, damages are presumed.  *Id.* at 984.  False statements containing an imputation of a

crime or which affects one's business, trade, profession or office are considered slander per se.

*Starobin v. Northridge Lakes Dev. Co.*, 287 N.W.2d 747, 752-53 (Wis. 1980).  If a statement is

19

capable of both a defamatory meaning and a nondefamatory meaning, a jury question is presented, and summary judgment is not proper.

In one sense, Reigel's statement to the board can be seen as a true statement. His purpose and intent was to purchase SRI stock, and purchasing stock is, for many people, investing in a company. It is also undisputed that a substantial portion of his investment went to Whelan. The implication that Whelan had a duty to deposit the money into SRI's account but instead pocketed the money himself would be defamatory, but this implication is undercut by the fact that shortly after Reigel's letter to the SRI board, the stockholders of SRI elected Whelan as president of the company. (Ledbetter Decl. ¶ 7; Whelan Decl. ¶ 26.) It is difficult to argue that your reputation was harmed when the receivers of the allegedly defamatory statements name you the head of their company. Under the circumstances, I conclude that the question of whether Reigel's statement to the board was defamatory presents a jury question and summary judgment is not appropriate.

Whelan also claims he was defamed when Reigel, through counsel, told the Department of Financial Institutions (DFI) that Reigel was unaware of Whelan's problems with Arizona officials. Whelan argues this statement was false because all of the prospectuses Reigel received disclosed the existence (if not the details) of the ACC actions. Even so, however, Reigel's statement that he was "not aware of Mr. Whelan's problems with Arizona officials" does not necessarily defame Whelan. It can be seen as simply a statement (whether true or not) about what Reigel himself knew, and thus does nothing to harm Whelan's reputation. Summary judgment as to this statement will also be denied.

## 2. Breach of the release

Whelan also brings a breach of contract claim based on the release Reigel signed on June 6, 2001. Because Reigel agreed not to sue him for anything related to SRI or Whitman Place, he

20

violated that agreement by bringing the present lawsuit and should be required to pay Whelan's legal fees and costs. Reigel argues, however, that the release was not supported by consideration, that the present situation was not contemplated by Reigel at the time he signed the release, and that the release was obtained by Whelan's fraud. As to the fraud question, the defense is that Reigel was defrauded into signing the release because he did not know that Whelan was personally using the funds and that Whelan "chose to stay silent on these basic facts." (Pl's Br. at 34.) Again, however, Reigel has not identified any duty (apart from a vague reference to a fiduciary relationship) Whelan had to disclose all of his activities. In Reigel's world, since Whelan "should" have told him he was going to use the $1.35 million personally, Reigel was defrauded when he signed the release not knowing that fact. This, as discussed in depth above, does not constitute fraud. Indeed, Reigel's explanation of fraud borders on the bizarre. In italics, he tells us that "[o]n top of all that, Whelan created a cover story by telling Reigel that Whelan wanted a release because Reigel was complaining about how Harrington failed to release Reigel's locked-up quepasa.com stock and his resulting loss and was further dissatisfied about other unrelated investments." (Pl.'s Br. at 34.) That "cover story," however, relates solely to quepasa.com, an earlier investment, and has absolutely nothing to do with the present case. How would it even provide "cover" for the fact that Whelan sought a release for any liability resulting from Reigel's investing in Whitman Place or SRI? Accordingly, there is no evidence that Whelan obtained the release by fraud.

Reigel also attacks the release on the grounds that the present scenario–a fraud action based on omissions and statements about where the money would go and how much Reigel would pay for SRI stock–was not contemplated by the parties at the time the release was signed. However, Reigel's view that a release only covers matters that are "contemplated" by the parties would

21

destroy the very purpose of releases, which is to create certainty. When one releases another from all claims "regarding" or "with regard to" any of a number of named transactions, one is explicitly foregoing innumerable claims that might not be contemplated. That is the nature of global releases like the one Reigel signed; to claim that the release only applied to claims Reigel knew about would defeat the very purpose of the release and would contradict its plain language.

Finally, Reigel claims the release was lacking in consideration. Whelan claims that Reigel was willing to sign the release in exchange for Whelan's repricing of the SRI shares from $2.70 to $1.23, which was done to ensure Reigel got a better deal than all of the other (non-founder) investors. Reigel does not dispute this, but argues that consideration was lacking because Whelan was *already* obligated to do that pursuant to his oral promise that Reigel would get the best price. In other words, because Reigel was already entitled to pay the lowest price for the SRI shares, Whelan was not giving him anything of additional value (i.e., consideration) in exchange for signing the release. "[A] promise to do something which the promisor is already legally obligated to do does not constitute consideration." *Holcomb v. United States,* 622 F.2d 937, 941 (7th Cir. 1980).

But the original operating agreement made no mention about Reigel receiving the lowest price of all investors, and it is unclear whether even assuming such a promise was made, it was intended to refer to all future investors or only those who were expected to participate in the previously arranged initial offering. Given this uncertainty, Whelan's agreement to arrange for an increase in the shares Reigel would receive for his initial investment must be viewed as a compromise of a disputed claim. A compromise of a disputed claim constitutes valid consideration. *Flambeau Products, Inc. v. Honeywell Information Systems, Inc.*, 341 N.W.2d 655, 665 (Wis. 1984). The fact that consideration was given is further confirmed by the recital in the release

22

agreement that expressly states that it was entered into "for consideration and services already rcvd. from Mr. Whelan." This plainly indicates the parties' recognition that the agreement was not illusory but was an arm's length transaction based on consideration. Thus, the undisputed evidence establishes that Reigel received consideration for the release.

But even aside from the fact that the undisputed evidence establishes that Reigel did receive consideration for his release, the parties signed the agreement under seal. "Under Wisconsin law, when an executed contract is signed under seal, the seal is conclusive proof of consideration, and consideration may not be impeached absent a factual showing of fraud." *Mitchell Bank v. Schanke,* 676 N.W.2d 849, 856 (Wis. 2004). Reigel argues that the contract was not executed but was executory because its profit sharing provisions were forward-looking and uncompleted, in which case the fact that it was signed under seal is only presumptive evidence of consideration rather than conclusive proof. *See id.* at 857. But there is nothing at all executory about the release agreement. The consideration, as the agreement clearly states, had been received by Reigel in the past. The release itself is a binding promise not to sue—it is executed once signed because neither the beneficiary of the release nor the releasing party must wait for anything else to happen. *See also* John Calamari & Joseph Perillo, *The Law of Contracts,* § 21.11 ("A release is an executed transaction.") Thus, Reigel's claim that the release was executory fails, and because the agreement was signed under seal, the evidence of consideration is conclusive. *See, e.g., Getchell v. Lancaster,* 1997 WL 148601, at *2 (E. D. Pa. 1997)("Getchell attempts to avoid the effect of the release by asserting that it was not supported by consideration. However, Getchell signed the release under seal. In Pennsylvania, a 'seal imports consideration.' Therefore, his argument is without

23

merit.")(citations omitted) Accordingly, the plaintiff's claim that the release is not supported by consideration fails as a matter of law.

Given a binding and enforceable release, a question remains about what damages, if any, the defendant sustained by having to defend against this action in violation of the release. Whelan seeks attorney's fees and costs, which presumably constitute consequential damages, and that seems a reasonable request on its face. Yet there appears to be a majority view that "under the American rule, attorney's fees are not awardable where there has been a breach of a release and covenant not to sue unless attorney's fees were provided for in that release." *Gruver v. Midas International Corp.,* 925 F.2d 280, 284 (9th Cir.1991). *See also Crossroads Partners v. Utah Crossing, Ltd.,* 191 F.3d 459, 1999 WL 701898, at *5 (9th Cir. 1999)("[U]nder Nevada law, the non-breaching party who successfully defends an action brought in violation of a release agreement is not entitled to an award of attorney fees without a statutory, rule-based, or contractual authorization for such an award. Because the release agreement in this case contains no provision for attorney fees, and no statute or rule provides for their recovery in an action such as this, BAN may not recover its attorney fees as an element of damages for Crossroads' breach of the release agreement."); *Larken Management, Inc. v. SMWNPF Holdings, Inc.*, 166 F.3d 1209 (4th Cir. 1998)("[T]he American Rule bars an award of attorney's fees and other litigation costs as 'damages' for such a breach, unless the release provides for them."); *Clark v. City of Orrville,* 1995 WL 231193, at *5 (Ohio Ct. App. 1995)("Attorneys' fees may properly be recovered as damages due to the breach of a release contract if the release explicitly provides for the recovery of such fees as damages. Absent such explicit agreement, however, attorneys' fees are not recoverable."); *but cf. Wellens v. Columbia Cas. Co.,* 946 F.2d 902, 1991 WL 216484, at *2 (10th Cir. 1991)("[A]ttorney's fees, however, may be

24

recovered for prevailing on a counterclaim which alleged breach of the release and sought attorney's fees as consequential damages for that breach.").

This issue has not been briefed by the parties and my own research has not revealed that Wisconsin courts have taken a position on this issue one way or the other. Under these circumstances, I decline to grant summary judgment on the issue of attorneys fees and costs. Should Whelan wish to pursue his contract claim for attorney's fees, he must file a memorandum of law supporting that claim within 21 days of the date of this order. The plaintiff will then have 14 days in which to respond.

## IV. Conclusion

For the reasons stated above, the defendant's motion for summary judgment is GRANTED as to the plaintiff's claims, which are hereby DISMISSED. The defendant's motion for summary judgment on his defamation and breach of contract claims is DENIED. If defendant wishes to pursue his claim of attorney's fees and costs as damages for his breach of contract claim, he must file a memorandum of law in support of his claim within 21 days of the date of this order, and plaintiff will have fourteen days to respond. In any event, the clerk shall set this matter for a Rule 16 conference forthwith.

**SO ORDERED.**

Dated this   10th   day of November, 2005.


s/ William C. Griesbach
William C. Griesbach
United States District Judge